IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JANUARY SESSION, 1998

FILED

March 31, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9606-CC-00278 |
| | ) | |
| Appellee, | ) | |
| | ) | CHEATHAM COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. LEONARD W. MARTIN, JUDGE |
| RICHARD BURT McKEE, | ) | |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |

FOR THE APPELLANT:

**GREGORY D. SMITH**
One Public Square, Suite 321
Clarksville, TN  37040

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**KAREN M. YACUZZO**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN  37243

**DAN M. ALSOBROOKS**
District Attorney General

**JAMES WALLACE KIRBY**
Assistant District Attorney General
105 Sycamore Street
Ashland City, TN  37015

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# **OPINION**

The Defendant, Richard Burt McKee, appeals as of right from his conviction following a jury trial in the Cheatham County Circuit Court. Defendant was convicted of first degree murder and was sentenced to life imprisonment without parole. The Defendant presents the following issues on appeal:

1) whether there was sufficient evidence to sustain a verdict of guilt beyond a reasonable doubt of first degree murder;

2) whether the venue of the murder was adequately established by professional or expert testimony in Cheatham County; and

3) whether a sentence of life without parole is excessive.

We affirm the judgment of the trial court.

SUFFICIENCY OF THE EVIDENCE

Defendant argues that the record is insufficient to establish the elements of premeditation and deliberation for a conviction of first degree murder. He contends that the shooting was a matter of mutual combat, voluntary manslaughter or criminally negligent homicide.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with

a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not this court.  State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987).  Nor may this court reweigh or reevaluate the evidence.  Cabbage, 571 S.W.2d at 835.  A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State.  Grace, 493 S.W.2d at 476.

The State presented several witnesses in its case-in-chief.  Susie Ferguson testified that she had been a friend of the victim, Terry Neblett, all of her life, and that she has known the Defendant since she was in the seventh grade.  She stated that Defendant dated Kenya Fuqua for some period of time. After Fuqua and Defendant separated, the victim and Fuqua began to date.  On several occasions following the beginning of the victim and Fuqua's relationship, she witnessed the Defendant threaten to kill the victim.  The first incident was in October 1993. The Defendant came to Ferguson's home looking for the victim and stated that "He [victim] took his woman away from him . . and he [Defendant] wasn't going to take it . . . he might kill them both."  Ferguson recalled at least three (3) other occasions that Defendant threatened the victim.  On one of those later occasions, Defendant stated that he had been "locked up" before, and that it wasn't any big thing as he had done time before.  He further stated that he was looking for the victim and "was going to catch

up to him some day." The final occasion Defendant spoke of the victim in Ferguson's presence was at Ferguson's wedding. The Defendant arrived early for the wedding, but explained that he could not stay because he knew the victim and Fuqua would be there and to avoid trouble, he was just going to leave.

Jimmy L. Murphy lived approximately three (3) to five (5) miles from Pinnacle Point, the area of the shooting. He had been acquainted with the victim for approximately five (5) years and had known the Defendant for approximately eight (8) years. On June 12, 1994, the Defendant came by Murphy's home. Sherry Neblett, the victim's ex-wife, was there with Murphy and some friends. They were grilling out when Defendant arrived, and Murphy could see that the Defendant was frustrated when he pulled up in his car. Murphy went out to the car to talk to the Defendant, and Defendant described a confrontation he had with the victim earlier that morning. Defendant asked Murphy to go with him to confront the victim, but Murphy refused. When Murphy asked the Defendant if he had a gun with him, the Defendant responded that he did not and did not need a gun. At that time, Sherry Neblett came out of Murphy's house and agreed to go with the Defendant. Because Sherry was afraid of the victim, she said she would not go without a gun and went back inside to get her gun. When she returned with a .38 caliber pistol, she left with the Defendant.

Approximately forty-five (45) minutes after they left, Sherry and the Defendant returned with Sherry driving the Defendant's car. Both appeared to be upset. Defendant stated that he shot the victim but did not think that he had killed him. Murphy called 911 to notify emergency personnel about the shooting.

Officer Floyd Duncan, investigator with the Cheatham County Sheriff's Department, worked at the crime scene at Pinnacle Point. Pinnacle Point is a location where the three counties of Cheatham, Montgomery and Dickson converge. Duncan stated that he was familiar with the county lines and drew a map of the crime scene. There is a creek there, and the south bank of that creek is in Cheatham County and the north bank is in Montgomery County. Duncan determined that the murder occurred in Cheatham County by going to the tax assessor's office and looking at the line down the center of the creek.

While Defendant had already left the scene of the crime when Duncan arrived, Duncan determined from various witnesses that there was only one gunshot and that the Defendant had left the scene with the weapon. Duncan stated that the weapon has still not been recovered. The bullet found in the victim was consistent with that from a .38 caliber pistol. Several hours later, the Defendant was taken into custody in Montgomery County and then transported to Cheatham County.

Shelby Jean Sevilles, the owner of Jean's Cash and Carry, has known the Defendant for thirty-six (36) years. Sevilles' store is located two (2) and one-half miles from Pinnacle Point. On June 12, 1994, the Defendant came by Sevilles' store and asked to use her telephone. When Sevilles asked the Defendant if it was a long distance call, he said that it was and she responded that he could call collect. Defendant agreed and gave her the telephone number. Sevilles made an error while dialing the number, so she started to dial again. The Defendant said "Just forget it, I have got to go," and left the store. Sevilles testified that the Defendant was calm. Several minutes later, another boy came in and told Sevilles that there had been a shooting down at the creek and to call 911.

Faith Karen Stoneman went swimming at Pinnacle Point with her boyfriend, Doyle Miles, and friends Becky Swaw, Sam Taylor and Matt Miles on June 12, 1994. It was close to 5:00 p.m. when they arrived. They parked their cars on the Montgomery County side of the bridge and went under the bridge and down the embankment to get into the water. She was swimming when she heard a loud hissing sound. Just after she heard the hissing she heard her boyfriend screaming to get out of the water, that someone was slashing tires and had a gun. She was swimming with Swaw, and they turned around and looked at the Cheatham County side of the bridge. One man rushed towards another man and they started struggling. One had a gun in his hand, but Stoneman could not see his face. She remembered someone screaming, "I'm going to get you. I'm going to get you," and that it was not the victim who screamed these words. Stoneman and Swaw went up the embankment to leave, but Stoneman turned back to try to see the man who was holding the gun. The men continued to struggle. Stoneman's boyfriend then came down and drug her back up the bank. They heard someone scream "[t]he kids, the kids. Not in front of the kids." Stoneman heard the shot, and she immediately began to try to get several children in the area out of the way. Stoneman and her friends then went to a nearby house to call the police.

Doyle Miles, Stoneman's boyfriend, testified that he was standing near the bridge when a man in a black T-bird drove up from the Montgomery County side. The man had a gun hanging out the window, and there was a passenger in the car, but Miles could not tell if it was a man or woman. The man jumped out and used a knife to cut the tires on a parked car. Then, the man jumped back in his car and drove across the bridge, still holding the gun. Miles saw the man park his car and run down the bank with the gun in his hand. He identified the Defendant at trial as

the man holding the gun. He and the victim began fighting, but Miles believed that the victim was only trying to get the gun out of the Defendant's hand. Miles heard a shot, and he and his friends left to call 911. When they returned, the victim was lying there and had been shot just below the waistline.

Becky Swaw Taylor, formerly Becky Swaw, testified that she was also at Pinnacle Point on June 12, 1994. She and her friends parked on the Montgomery County side and then went to swim. Swaw was swimming with Faith Stoneman when they heard a hissing sound. Immediately, their friends began screaming that someone was slashing tires. Swaw saw a man come down from the bridge with a gun and go towards the victim. The man and the victim began fighting, and Swaw turned to leave. She heard a shot, and turned around to see that the two men had fallen to the ground.

Samuel Taylor, Becky Swaw Taylor's husband, was also swimming at Pinnacle Point. He made similar observations, but also saw the Defendant walk back to his car after the shooting. Taylor identified this man as the Defendant at trial.

Julie Neblett was the sister-in-law of the victim. She went to Pinnacle Point on June 12, 1994 with her husband and two children. When they arrived, the victim, Kenya Fuqua and Fuqua's two children were already there swimming. After Neblett and her family got there, they all went swimming on the Cheatham County side. She and Fuqua were sitting with their feet in the water when they heard what sounded like breaking glass. Neblett thought that someone had wrecked their car. When she heard the sound again, Neblett began to run up the bank to get her sons out of the

way. Neblett heard a car speed up and then slam on the brakes. When she looked up, the Defendant was standing there with a gun in his hand. Fuqua was standing directly behind Neblett, with the victim standing down by a tree near the water.

Neblett's son was in her arms, so she dropped him to the ground and tried to push him down the bank. She also pushed Fuqua down the hill and told her to run, then screamed for her kids to get out of the water. The next thing Neblett saw was the Defendant and the victim twisting around in circles, both trying to get possession of the gun. She was screaming for them to stop and trying to get the kids out of the way when she heard a pop. When Neblett turned, the victim fell to the ground. The Defendant stepped back and then pointed the gun at the victim. He mumbled something and then told Neblett that "[she] better save him." The Defendant returned up the bank with the gun in his hand. Neblett followed to check on her children. The driver's side door to the Defendant's car was open, and Sherry Neblett was inside. The Defendant did not say anything, but got into the passenger's seat. Sherry Neblett and Defendant drove off towards Cheatham County. Neblett further stated that the car in which the victim, Fuqua and their children arrived at Pinnacle Point was the car which had the slashed tires.

Julie Neblett went home to stay with the children, including Kenya Fuqua's. Between a half hour to an hour after the shooting, she received two telephone calls from the Defendant. During the first phone call, the Defendant stated that, "[W]e all deserved what happened at the creek." In the second call, Defendant threatened "that Fran [Kenya Fuqua's mother] was going to get it because she allowed Kenya's children to be with Kenya and [the victim] that day . . . and that they were crack-heads and she knew it." During this second conversation, the Defendant, who had

-8-

call-waiting, received another call and clicked to the second call. When he clicked back to speak with Neblett, he said "Well, he's dead, and I'm out of here."

Larry Bryant, the Director of 911 for Montgomery County, testified that on June 12, 1994, Clinton Davis called at 5:09 p.m. to report the shooting at Pinnacle Point. Bryant stated that two (2) other calls were also made to 911 regarding the shooting, one from Julie Neblett at 6:30 p.m. and another from Kenya Fuqua at 7:58 p.m. He did not receive any other calls regarding the incident.

Larry Bruce, Director of Dickson Central Communication, supervises all communications including 911. On June 12, 1994, Jean Sevilles called 911 at 5:30 p.m. from Jean's Cash and Carry. Steve Smith, the Cheatham County 911 Director, stated that there was no record of any calls regarding Pinnacle Point on June 12, 1994.

Barney Reed, the paramedic supervisor for Montgomery County, responded to an ambulance call at Pinnacle Point. The call came at 5:14 p.m. When Reed arrived, CPR on the victim was already in progress, and they continued CPR although the victim had no vital signs. The victim was transported to Clarksville Memorial Hospital where he was later pronounced dead. There appeared to have been three (3) bullet wounds under the right side of the victim's abdomen.

Charles Harlan, M.D., the consulting forensic pathologist for Cheatham County, performed the autopsy of the victim on June 12, 1994. The victim died as a result of a near gunshot wound in the right lower quadrant of his abdomen. A "near gunshot wound" is one in which the muzzle of the gun is between zero (0) to

twenty-four (24) inches from the victim's skin. There was powder in the wound, with stippling of nine (9) inches in diameter. Stippling indicates the distance from the end of the muzzle to the skin surface, and Dr. Harlan estimated that the muzzle of this particular gun was probably between nine (9) to twelve (12) inches from the victim's skin. While the gunshot wound was from a single bullet, there were three separate wounds on the victim's abdomen, one from the entry of the bullet, one from the exit, and one from the reentry of the bullet. The three (3) wounds were all in the fleshy, soft tissue of the abdomen, possibly occurring due to the pinched position of the victim's body as he was shot. The victim's right common iliac artery and vein were injured, causing internal bleeding. As a result, the victim likely died within a period of fifteen (15) to twenty (20) minutes.

Clifton Smith, deputy for the Montgomery County Sheriff's Department, testified that he responded to the call on June 12, 1994 for assistance in a death investigation at Pinnacle Point in Cheatham County. During his investigation, Deputy Smith first came into contact with the Defendant at the Montgomery County jail around 9:00 p.m. Defendant and Deputy Smith knew each other prior to this meeting. Lieutenant Hastings and Sergeant Pat Haynes were also present, and Hastings read to Defendant his constitutional rights. Defendant asked to speak with Smith alone as he did not trust the Cheatham County authorities.

After the other officers left the room, Defendant stated that he was having problems with the victim, that the victim had stolen his wife, kids, money, and farm and that he was out to get the victim. Defendant stated that this came to a head at the Pinnacle Point Bridge, that it "was all he could take." Smith asked if he could take notes, and Defendant agreed. The Defendant's statement is as follows:

I walked down the creek bank. Come on. I got something for you. I got him down fighting. He had the gun. I hit him with fist. (Right hand). Then he came out with the gun and placed it underneath my chin. I grabbed his hand and pushed the gun towards his stomach area. Then the gun went off (one). We were fighting underneath the bridge.

The State then rested its case-in-chief.

Jesse Donald Herrell testified for the defense. On June 12, 1994, Herrell was with Sherry Neblett at Jimmy and Rita Murphy's home having a cookout. Herrell and Sherry Neblett were seeing each other. The Defendant stopped by, but did not get out of the car. He hollered out and asked Neblett to ride down to the creek with him. Neblett agreed, but before they left she went back into the trailer. When she came out she had a gun in her hand. While Herrell did not know if the Defendant saw the gun or not, Sherry was not trying to hide the gun on her way out of the trailer. Neblett stuck the gun in her purse. When Herrell asked her what she was going to do the gun, she stated that she was not going to go without it because she was afraid of the victim. When Defendant and Sherry returned, Sherry was upset, nervous and crying. The Defendant stayed approximately thirty (30) minutes, then left.

Lynette McKee Arthur, the Defendant's sister, had known the victim for fifteen (15) to twenty (20) years. In August 1993, the victim lived with the Defendant and Kenya Fuqua. Shortly after the victim moved out, the Defendant and Fuqua broke up and the victim and Fuqua began to date. While Arthur knew that she had not seen the victim and the Defendant together since the victim moved out, she knew they later patched up their relationship and were on cordial terms. Arthur testified that she saw the victim and the Defendant together at parties and at businesses, and she never heard the Defendant threaten the victim. On the day of the killing, Arthur

-11-

went to her sister's trailer to get the Defendant and take him to the Montgomery County jail. When she got to her sister's, the Defendant was trembling, nervous, muddy and unable to speak clearly. The Defendant volunteered to go to jail.

Alexis Worthing, Wanda Wallace and Herrell all testified that the Defendant had overcome his hard feelings toward the victim. They saw the Defendant and the victim around each other, and they seemed to be cordial. They never saw or heard the Defendant threaten the victim.

Billy Hodges was with the Defendant on June 12, 1994. He testified that prior to that occasion he had seen the victim and the Defendant go to the store together, return, shake hands and hug. On the day of the shooting, Hodges and Defendant were drinking a twelve (12) pack of beer, and the Defendant was discussing the victim and Fuqua. Defendant stated that he hoped that the victim "did not end up getting them kids on crack rock." Hodges stated that crack rock referred to cocaine. The Defendant later left Hodges at Tatum Bridge, but he did not have a gun at that time.

In order to convict the Defendant of first degree murder, there must have been an intentional, premeditated and deliberate killing of another. Tenn. Code Ann. § 39-13-202(a)(1991 Repl.). At the time of this offense, a deliberate act was an act performed with cool purpose, and premeditation occurred when an act was done after the exercise of reflection and judgment. Tenn. Code Ann. § 39-13-201(b)(1) and (2)(1991 Repl.); State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Both the elements of premeditation and deliberation are questions for the jury and may be inferred from the manner and circumstances of the killing. State v. Gentry, 881

S.W.2d 1, 3 (Tenn. Crim. App. 1993). The State is entitled to prove the offense by circumstantial evidence alone. State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992).

In the light most favorable to the State, there was sufficient evidence whereby a reasonable trier of fact could have found the Defendant guilty of first degree murder beyond a reasonable doubt. Beginning in 1993, the Defendant made numerous threats to the victim because he believed that the victim "stole his woman." Even in early 1994, the Defendant continued to threaten the victim according to one witness. Declarations by the defendant of his intent to kill and the defendant's prior relationship with the victim are both circumstances which are indicative to the jury of the elements of premeditation and deliberation. Brown, 836 S.W.2d at 541-42; State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

On the day of the murder, the Defendant and the victim had a confrontation. Defendant expressed his anger to his friend, Billy Hodges, while they were drinking beer. Later that day, the Defendant drove to the Murphy's home and again told of his plan to confront the victim. He took Sherry Neblett, a co-defendant, with him to Pinnacle Point. Before Neblett would get in the car with Defendant, she retrieved a .38 caliber pistol. Witnesses described Defendant as driving over the bridge to the scene at Pinnacle Point holding a gun and hanging it out the window. Upon arriving at the scene, Defendant jumped out of his car and used a knife to slash the victim's tires. Defendant completely disabled the victim's vehicle, and the jury was entitled to infer that this slashing of the tires was performed so that the victim could not escape the scene. Planning activity prior to the killing of the victim is a circumstance the jury may use to infer the elements of premeditation and deliberation. Bordis, 905

S.W.2d at 222. After slashing the tires, Defendant drove over the bridge and ran, brandishing a gun, towards the victim screaming, "I'm going to get you. I'm going to get you." The victim was unarmed and had been swimming. The use of a deadly weapon upon an unarmed victim is such that the jury was entitled to infer both premeditation and deliberation. Brown, 836 S.W.2d at 541.

The victim struggled with the Defendant, but was unable to protect himself and was shot in the stomach by the Defendant. While the Defendant alleged in his statement to police that the victim pulled out a gun after Defendant approached him, the jury chose to accept the testimony of numerous other witnesses. We may not reevaluate this evidence. Cabbage, 571 S.W.2d at 835.

Motive is not an element of first degree murder, but, if proven, it reflects upon the elements of first degree murder. Obviously, the Defendant resented the victim's relationship with Kenya Fuqua. Following the shooting, the Defendant called the sister-in-law of the victim and proceeded to tell her that "her family deserved what happened." He then called a second time to threaten Kenya Fuqua's mother for allowing Fuqua's children to be around the victim. Furthermore, in his own statement, the Defendant admitted that he was "out to get the victim" because the victim had "stole his wife, kids, money and farm."

Finally, following the murder, the Defendant calmly walked away from the scene with the weapon. He stopped at a local market, Jean's Cash and Carry, and asked to use the phone. The Defendant did not call 911 and did not mention the shooting to the owner of the store. The store's owner testified that the Defendant

appeared very calm.  Calmness immediately after a killing may be evidence of a cool, dispassionate, and premeditated murder.  <u>West</u>, 844 S.W.2d at 148.

As Defendant deliberately and with premeditation went to Pinnacle Point to confront the victim, and intentionally approached the victim with a loaded gun screaming, "I'm going to get you.  I'm going to get you," the jury could have found beyond a reasonable doubt that the Defendant was guilty of first degree murder.  This issue is without merit.

VENUE

The Defendant argues that the State did not adequately establish that the murder occurred in Cheatham County, and therefore, that the matter should be remanded for a new trial.  Under Tennessee Code Annotated section 39-11-201(e), the State must prove venue "by a preponderance of the evidence."  As the Defendant concedes, the State can meet its burden of proof by only presenting slight evidence, so long as it is based upon more than mere speculation.  <u>See</u> <u>State v. Bloodsaw</u>, 746 S.W.2d 722, 724-25 (Tenn. Crim. App. 1987).  Venue may be shown by a preponderance of the evidence which may be either direct or circumstantial or both.  <u>Hopper v. State</u>, 205 Tenn. 246, 326 S.W.2d 448, 451 (1959) (citations omitted).

Pinnacle Point, as described by various witnesses, is the convergence of three (3) counties and two (2) creeks. The Defendant concedes that the crime occurred in either Montgomery or Cheatham County. Under the Tennessee Rules of Criminal Procedure, "[o]ffenses committed on the boundary of two (2) or more counties may be prosecuted in either county." Tenn. R. Crim. P. 18(c). Therefore, even if the State only presented evidence that the murder occurred at the converging point of the two (2) counties, then the evidence would still be sufficient to establish the proper venue in Cheatham County.

Based upon the testimony of many individuals, including police officers familiar with the county lines and individuals from within the community, the murder occurred in Cheatham County. While the officers did not witness the shooting, all the eyewitness testimony and evidence inferred that the crime occurred on the south side of the bridge, which is the Cheatham County side. As the Defendant points out in his brief, an officer's rational belief that a crime occurred within a given county can meet the burden of proof to show proper venue. See State v. Chadwick, 750 S.W.2d 161, 165 (Tenn. Crim. App. 1987). In the light most favorable to the State, the jury was entitled to infer that the Defendant committed the crime in Cheatham County. The Defendant failed to present any conflicting evidence, and this issue is without merit.

SENTENCE

Defendant challenges the sentence of life without parole as being excessive under the facts of this case. Defendant specifically contends that the mitigating

factors outweigh the aggravating factors in the circumstances of this case. Defendant argues that a sentence of life imprisonment is appropriate.

In considering the appropriateness of Defendant's sentence, this court shall first consider any errors assigned. Tenn. Code Ann. § 39-13-207(g). Life imprisonment without the possibility of parole is an appropriate sentence "if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in [Tenn. Code Ann.] § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." Id. Upon review, we affirm the sentence of life imprisonment without the possibility of parole.

At the sentencing hearing, the State relied upon the evidence at trial and two previous convictions of the Defendant. The parties stipulated to Defendant's 1979 California conviction of robbery with the use of a deadly weapon and a 1983 Tennessee conviction of voluntary manslaughter. The jury was instructed that both crimes involved the use of violence to the person. The Defendant presented numerous witnesses, all of whom testified as to the Defendant's character within the community regarding his acts of goodwill and kindness to children in particular.

In this case, the jury imposed the sentence of life imprisonment without the possibility of parole following the sentencing hearing. The jury found that the following aggravating factors applied: (1) defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; and (2) defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during

the act of murder.  Tenn. Code Ann. § 39-13-204(i)(2) and (3).  We agree with the jury's findings as to the application of the above aggravating factors.  First, the Defendant's criminal record was stipulated to include two (2) prior felonies which involved violence to the person.  Second, the Defendant knowingly carried a loaded .38 caliber pistol to a crowded swimming area, with both children and adults in nearby vicinity to the victim.  Defendant admitted that he went there to confront the victim, and his use of a weapon within such close proximity to those nearby was a knowing risk on his part that someone other than the Defendant might have been injured or killed.

The Defendant argues that the mitigating factors outweigh the aggravating factors in this case.  The Defendant asked the jury to consider the testimony of these witnesses and apply any mitigating factors under Tennessee Code Annotated section 39-13-204(j) which relate to that testimony.  The mitigating factors are as follows:

1) The defendant has no significant history of prior criminal activity;
2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
3) The victim was a participant in the defendant's conduct or consented to the act;
4) The murder was committed under circumstances which the defendant reasonably believed to provide a moral justification for the defendant's conduct;
5) The defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor.
6) The defendant acted under extreme duress or under the substantial domination of another person;
7) The youth or advanced age of the defendant at the time of the crime;
8) The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment; and

9) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing.

The only evidence presented by the Defendant was regarding his reputation in the community for performing acts of kindness. While this is appropriate as evidence for mitigating factor nine (9), no other factors are applicable in this case. Based upon his prior convictions, Defendant did have a history of prior criminal activity. The murder was not committed while the Defendant was under extreme mental or emotional duress. While it was suggested that Defendant was upset over losing his girlfriend to the victim, the only witnesses who were with the victim that day did not testify as to any extreme duress the Defendant was experiencing. As witnesses described the victim acting in self-defense, the victim was not a participant in the Defendant's conduct.

While there was some testimony as to the nature of the victim's relationship with Kenya Fuqua's children, the Defendant, in his own statement, did not tell the police that he believed he was morally justified in killing the victim for any reason. Instead, the Defendant stated that, "the victim had stole his wife, kids, money, and farm and that he was out to get the victim." There were no accomplices to the murder, and the Defendant was not acting under extreme duress as heretofore stated. The Defendant's age was not a factor in the crime. Finally, there was not sufficient evidence to suggest that the Defendant could not appreciate the wrongfulness of his conduct or conform his conduct to the law. While there was testimony that the Defendant had been drinking that day, the witnesses who were with the Defendant just prior to the murder testified that Defendant did not appear to be under the influence, only that he had a few beers.

When reviewing the aggravating and mitigating circumstances, if the aggravating circumstances are found to have been proven beyond a reasonable doubt, then the jury may sentence the defendant to either life imprisonment or life without parole, in its discretion. Tenn. Code Ann. § 39-13-207(c). As the jury found that both aggravating circumstances were present as argued by the State, it was within the jury's discretion to determine if a sentence of life imprisonment without parole was appropriate, notwithstanding the existence of mitigating factors. Only a gross abuse of discretion would result in our finding an error. Id. at (g). Based upon the evidence and Tennessee Code Annotated section 39-13-207, we find that the sentence was appropriate and the jury did not abuse its discretion. This issue is without merit.

 

_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
DAVID H. WELLES, Judge


_____
JERRY L. SMITH, Judge